**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JOHN CHACHO, JR.,
Plaintiff,

v.

Case No. 3:25-cv-1126 (OAW)

JESUS GUADARRAMA, et al.,
Defendants.

# INITIAL REVIEW ORDER

Self-represented plaintiff, John Chacho, Jr., a sentenced inmate imprisoned at Corrigan Correctional Center ("Corrigan"),[1] has filed a fourth amended complaint under 42 U.S.C. § 1983 against fifteen prison officials, alleging that prison officials at MacDougall-Walker Correctional Institution ("MacDougall") violated his constitutional rights. He brings claims for excessive force, failure to intervene, and deliberate indifference to serious medical needs under the Eighth Amendment. Plaintiff seeks damages and declaratory relief.

The Prison Litigation Reform Act requires that federal courts review complaints brought by prisoners seeking relief against a government entity or officer or employee of a government entity. 28 U.S.C. § 1915A(a). Upon review, the court must dismiss the complaint, or any portion thereof, which is frivolous or malicious, which fails to state a

[1] Plaintiff was sentenced in September of 2023 and currently resides at Corrigan. *See* DOC, *Offender Information Search*, http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=392797 (last visited November 5, 2026). The court may take judicial notice of content on this website. *See*, *e.g.*, *Taveras v. Semple*, No. 3:15-cv-00531 (SALM), 2023 WL 112848, at *1 n.1 (D. Conn. Jan. 5, 2023).

claim upon which relief may be granted, or which seeks monetary relief from a defendant who is immune therefrom. *See* 28 U.S.C. §§ 1915(e)(2)(b), 1915A(b).

Accordingly, the court has thoroughly reviewed all factual allegations in the complaint and has conducted an initial review of the allegations therein under 28 U.S.C. § 1915A. The court's conclusions are as follows.

## I. FACTUAL BACKGROUND

The court summarizes only the basic factual allegations in Plaintiff's complaint necessary for context to the ruling below.[2]

On August 17, 2024, prison officials placed Plaintiff in the Restrictive Housing Unit ("RHU") for refusing housing. ECF No. 23 ¶ 1. While there, Plaintiff asked Defendant Baez to call the Medical Department because Plaintiff was experiencing pain from headaches. *Id.* ¶ 2. Baez refused Plaintiff's request. *Id.* ¶ 3. Plaintiff then asked to speak to a lieutenant. *Id.* Baez told Plaintiff that he was not calling anyone for Plaintiff and thereafter called Plaintiff a "b***h" and a "p***y" and walked away. *Id.* ¶ 3–4.

Plaintiff later asked Defendants Baez and Eckler to call the Medical Department and to permit Plaintiff to speak to a lieutenant. *Id.* ¶ 5. These officers ignored Plaintiff's

---

[2] Because "an amended complaint completely replaces the original complaint[,]" *Jordan v. Chiaroo*, No. 3:24-cv-204, 2024 WL 3925375, at *3 (D. Conn. Aug. 23, 2024) (citing *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977) (holding that the amended complaint completely replaces original complaint)), *aff'd*, No. 24-2397, 2025 WL 1720227 (2d Cir. June 20, 2025), the court "will only consider facts alleged in [Plaintiff's] [fourth] [a]mended [c]omplaint in support of his claims," *id.*

requests, telling him instead to "shut the fuck up." *Id.* (internal quotation marks omitted).

Later that day, prison officials called a "code" on Plaintiff and "chemical agent was deployed on him." *Id.* ¶ 6. Defendants Soto, Eckler, Baez, Dipietrantonio, Caputo, and Grasso "were present" when officers subsequently sprayed Plaintiff with chemical agent. *Id.* ¶¶ 6, 8. Defendants Betances, Bosque, and Milner "were the supervisors present and involved in the incident" as being "in charge" of the "oversight" of the other officers. *Id.* ¶ 8. After officers sprayed Plaintiff with chemical spray, Plaintiff "gave himself up willingly" and complied with the officers' orders. *Id.* ¶ 7. Once officers "cuffed up" Plaintiff, Defendants Soto and Dipietrantonio "forcefully grabbed" Plaintiff and "ushered" him down a staircase. *Id.* ¶ 9.

Defendants Betances told prison staff to place Plaintiff in the shower. *Id.* ¶ 10. Instead of decontaminating Plaintiff in accordance with DOC policy, prison staff pushed Plaintiff into a wall and put a spit mask over his head while he was attempting to clear his throat of chemical agent by spitting on the wall in front of him. *Id.* Defendants Soto and Dipietrantonio held Plaintiff while the other officers "stood by." *Id.* ¶ 11. Defendants Soto and Dipietrantonio then "pinned" Plaintiff against a wall and "forcefully" strip-searched him. *Id.* ¶ 12. Plaintiff remained compliant during the search. *Id.*

Plaintiff told Defendants Betances, Bosque, Milner, Soto, and Dipietrantonio "numerous times" that they were hurting his wrists. *Id.* ¶ 13. Baez told Plaintiff to "stop resisting," but Plaintiff was remaining "completely still." *Id.* ¶ 14 (citation modified). Instead of loosening their grip on Plaintiff, Defendants Soto and Dipietrantonio "applied more force." *Id.* Plaintiff asked Defendant Grasso, who was videoing the incident, to

come closer because Defendant's Grasso's "coworkers" were obstructing the camera's view. *Id.* ¶ 15. Defendant Grasso refused to move closer. *Id.* ¶ 16.

Plaintiff heard his right wrist "pop" as Soto and Dipietrantonio bent Plaintiff's wrists and applied "serious force" to them. *Id.* ¶ 17 (citation modified). Plaintiff told Soto and Dipietrantonio that they were "seriously hurting him." *Id.* Officers then placed Plaintiff in four-point restraints and put him in a "dry cell," where they left Plaintiff for the next few hours. *Id.* ¶ 18. While in the dry cell, Plaintiff told prison staff that he was in "serious pain" and that his handcuffs were too tight. *Id.* Defendant Bonetti said the handcuffs were "fine" and "approved the restraint check." *Id.*

After Defendant Bonetti approved Plaintiff's restraints, Plaintiff told Defendant Baez that Plaintiff was in "serious pain" and that his handcuffs were on "way to[o] tight" and cutting into Plaintiff's wrists. *Id.* ¶ 19. Plaintiff showed his swollen wrists to Defendant Baez, but Defendant Baez "brushed off" and "ignored" his concerns. *Id*. Defendant Baez told Plaintiff that medical staff would be back later to check his handcuffs after Plaintiff came off "BOS status."[3] ECF No. 23 ¶ 19.

Shortly after Plaintiff's interaction with Baez, prison staff called a "code white" after Baez found Plaintiff unresponsive on the floor of the dry cell. *Id.* ¶ 20. Defendant Cummings, a nurse, responded. *Id.* ¶ 21. After Plaintiff regained consciousness, he told Defendant Cummings that he was not sure if he hit his head, that officers had deprived

---

[3] While Plaintiff does not define this term, it appears to abbreviate "Behavioral Observation Status," *see* DOC, *Restrictive Housing System Study*, https://portal.ct.gov/doc/miscellaneous/falcon-report (last visited Nov. 5, 2026).

him of water, and that officers had denied his request to loosen his handcuffs. *See id.* Defendant Cummings "refused to acknowledge" Plaintiff's injuries. *Id.*

Prison officials removed Plaintiff from BOS status later that afternoon. *Id.* ¶ 22. Defendant Andreas was operating a camera while prison staff removed Plaintiff from BOS status. *Id.* ¶ 23. Plaintiff told Defendant Andreas to document his injuries with the camera, but Defendant Andreas "hesitated to do so." *Id.*

Plaintiff remained in "unbearable pain" and could not move his right wrist for the next two days. *Id.* ¶ 24. Despite Plaintiff "constant[ly] pleading" to Defendants Baez and Eckler for medical attention, these defendants did not permit Plaintiff to see medical staff for treatment. *Id.* Plaintiff was eventually seen by Defendant Estime, a doctor, for medical treatment two days after officers injured Plaintiff. *Id.* ¶ 25. After examining Plaintiff, Defendant Estime diagnosed Plaintiff with a "significant injury" and ordered X-rays of Plaintiff's right wrist. *Id.* ¶ 26. Medical staff also photographed Plaintiff's injuries. *Id.*

Medical staff sent Plaintiff back to his cell in the RHU without "wrapp[ing]" Plaintiff's wrist or providing him with a "removable cast." *Id.* Medical staff took X-rays of Plaintiff's wrist twelve days after his visit with Defendant Estime. *Id*. Medical staff then determined that Plaintiff's right wrist was fractured. *Id*. In August of 2024, Defendants Estime and Rodriguez "withheld" the X-ray results and "other documentation" from Plaintiff when he requested them. *Id.* ¶ 28.

Plaintiff now has "traumatic arthropathy of his right wrist." *Id.* ¶ 27. He still experiences "numbness," "tingling," and "severe pain" in his right wrist and hand, which has affected his ability to perform "daily tasks" using them. *Id.*

## II. DISCUSSION

Plaintiff seeks damages and declaratory relief from Defendants in their official and individual capacities. *See* ECF No. 23 ¶ 36.

### A. Claims for Declaratory Relief

To the extent Plaintiff seeks declaratory relief, *id.* at 29, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility," *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023). Thus, because Plaintiff transferred from MacDougall to Corrigan, *see supra* note 1, his claims for declaratory relief against Defendants (all MacDougall officials) are now moot, *see Salahuddin*, 467 F.3d at 272. Because Plaintiff's claims for declaratory relief are now moot, they must be dismissed. *See Thompson v. Carter,* 284 F.3d 411, 415–16, 420 (2d Cir. 2002) (affirming district court's dismissal of claims for prospective injunctive and declaratory relief against defendants from transferor facility).

### B. Official Capacity Claims for Damages

To the extent Plaintiff asserts official capacity claims for damages against Defendants (all state employees), such claims are dismissed as barred by the Eleventh Amendment. *See Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (affirming dismissal of "claims for damages against all of the individual defendants in their official capacities . . . because these claims are barred by the Eleventh Amendment") (citing *Kentucky v. Graham,* 473 U.S. 159, 169 (1985)). Thus, the court considers only whether Plaintiff has

sufficiently alleged claims against any defendant in his or her individual capacity for damages.

### C. Individual Capacity Claims for Damages

To seek damages from any defendant in their individual capacity, Plaintiff must allege facts establishing the personal involvement of that defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)).

"Personal involvement," the United States Court of Appeals for the Second Circuit has said, means either direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation modified). This applies to supervisory officials as well. *See Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) ("To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability.").

But before the court considers whether any defendant directly or indirectly participated in violating Plaintiff's rights, *Provost*, 262 F.3d at 155, it must first consider the threshold question of whether Plaintiff's complaint sufficiently alleges a violation of his rights, *see Wright*, 21 F.3d at 501 (only personal involvement in "alleged constitutional

deprivations" is required); *see also Brown v. Dep't of Corr.*, No. 3:16-cv-376 (WIG), 2021 WL 124417, at *8 (D. Conn. Jan. 13, 2021) (agreeing that plaintiff's placement in administrative segregation "cannot serve to establish *any* personal involvement in a constitutional violation because no constitutional violation occurred").

Construing the complaint "liberally" and interpreting it "to raise the strongest arguments that it suggests," *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007), the court understands Plaintiff to raise (1) Eighth Amendment excessive force claims, (2) Eighth Amendment failure to intervene claims, and (3) Eighth Amendment deliberate indifference to serious medical needs claims. The court addressed each seriatim.

1. **<u>Excessive Force Claims</u>**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, which includes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state a claim for the use of excessive force in violation of the Eighth Amendment, the plaintiff must allege facts establishing both objective and subjective components. *See Sims v. Artuz*, 230 F.3d 14, 20–21 (2d Cir. 2000).

The objective component "focuses on the harm done" to the prisoner in light of "contemporary standards of decency," and the amount of harm "depends on the nature of the claim." *Id*. at 21 (citation modified) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). "[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (citation modified) (quoting *Hudson*, 503

U.S. at 4). But the injury must be "more than *de minimis*." *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994). "Courts in this Circuit have consistently held that an injury is *de minimis* when it is temporary and/or minor in severity." *Smith v. City of N.Y.*, 1:04-cv-3286, 2010 WL 3397683, at *10 (S.D.N.Y. Aug. 27, 2010), *aff'd sub nom. Smith v. Tobon*, 529 Fed. Appx 36 (2d Cir. 2013) (collecting cases).

The subjective component of the excessive force standard requires a showing that the use of force was "carried out 'maliciously and sadistically' rather than as part of 'a good faith effort to maintain or restore discipline.'" *Wilkins*, 559 U.S. at 40 (quoting *Hudson*, 503 U.S. at 9). Courts must consider whether "the officials acted with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8. The extent of the inmate's injuries is one factor the courts may use to determine whether correctional staff could "plausibly" have considered the force necessary in a particular situation. *Id*. at 7. Other factors include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id*. (citation modified).

Plaintiff describes three incidents that could potentially give rise to an Eighth Amendment excessive force claim: (1) the use of a chemical agent during the cell extraction, (2) the use of force during the escort to the dry cell, and (3) the use of overly tight handcuffs or in-cell restraints when Plaintiff arrived at the dry cell. The court discusses each incident in turn.

**a. <u>Use of Chemical Agent During Cell Extraction</u>**

"Courts have considered the use of a chemical agent against a compliant inmate to be a use of excessive force." *Pedreira v. Pearson*, No. 3:24-cv-1875 (OAW), 2026 WL 2474685, at *4 (D. Conn. Aug. 24, 2026). But Plaintiff alleges only that "chemical agent was deployed on him," without specifying which defendant deployed the chemical agent. ECF No. 23 ¶ 6. Plaintiff alleges that Defendants Soto, Eckler, Baez, Dipietrantonio, Caputo, and Grasso "were present" and that Defendant Betances, Bosque, and Milner "were the supervisors present" when officers deployed chemical agent, *id.* ¶ 8, but "merely being present when a constitutional violation occurs is insufficient to establish personal involvement," *Jordan v. Wright*, No. 3:24-cv-1166 (VAB), 2024 WL 3742767, at *10 (D. Conn. Aug. 9, 2024).

Plaintiff additionally alleges that Defendant Betances, Bosque, and Milner were "involved in the incident," ECF No. 23 ¶ 8, but such "[c]onclusory allegations of personal involvement are insufficient," *Johnson v. Rowe*, No. 3:24-cv-617 (MPS), 2025 WL 1786083, at *6 (D. Conn. June 27, 2025). Absent allegations describing which defendant deployed chemical spray against Plaintiff, any excessive force claims based on the use of chemical spray must be dismissed for lack of personal involvement. *See Gonzalez v. Yepes*, No. 3:19-cv-00267 (CSH), 2019 WL 2603533, at *8 (D. Conn. June 25, 2019) (dismissing Eighth Amendment claim for lack of personal involvement because the "[c]omplaint contain[ed] only a description of the events that allegedly transpired, with no factual basis to distinguish each Defendant's conduct or determine in what way each Defendant participated in the allegedly unconstitutional acts") (citation modified).

**b. <u>Use of Force During the Escort to the Dry Cell</u>**

The court construes the complaint as alleging four separate, but related, instances of force used by officers while they escorted Plaintiff from his RHU cell to the dry cell.

First, after officers handcuffed Plaintiff, Defendants Soto and Dipietrantonio "forcefully grabbed" Plaintiff and "ushered" him down a staircase. ECF No. 23 ¶ 9. Next, prison staff pushed Plaintiff into a wall and put a spit mask over his head. *Id.* ¶ 10. Then, Defendants Soto and Dipietrantonio "pinned" Plaintiff against a wall and "forcefully" strip-searched him in the shower area. *Id.* ¶ 12. Any excessive force claim based on these allegations must be dismissed because Plaintiff does not allege that he suffered any injury during these specific uses of force. *See*, *e.g.*, *Holloway v. Douglas*, No. 24-cv-1172 (VDO), 2024 WL 3860070, at *3 (D. Conn. Aug. 19, 2024) (dismissing excessive force claim because plaintiff "d[id] not allege that he suffered any injury").

Lastly, Plaintiff maintains that Defendants Soto and Dipietrantonio subsequently bent his wrists until Plaintiff heard his wrist pop. ECF No. 23 ¶ 17. This resulted in Plaintiff sustaining a fractured wrist, "traumatic arthropathy," and "numbness," "tingling," and "severe pain" in his right wrist and hand that he continues to experience until present day. *See id.* ¶¶ 26–27, 29. Because Defendants Soto and Dipietrantonio broke Plaintiff's wrist when, by Plaintiff's account, he was compliant, *see id.* ¶ 12, Plaintiff has sufficiently stated an excessive force claim against Defendants Soto and Dipietrantonio for purposes of initial review, *see*, *e.g.*, *Ortiz v. Bennett*, No. 3:17-cv-593 (JAM), 2017 WL 3401259, at *2 (D. Conn. Aug. 8, 2017) (plaintiff stated excessive force claim by alleging correctional officers "push[ed] [plaintiff] against the wall, bounc[ed] his head against the wall, twist[ed] his wrists and appl[ied] the handcuffs so tight that his wrists began bleeding").

c. **Use of Overly Tight Handcuffs or In-Cell Restraints**

A plaintiff also may state an excessive force claim by alleging that (1) prison officials placed overly tight handcuffs on him or that (2) prison officials kept him handcuffed while in a cell. *See Witt v. Armstrong*, No. 3:20-cv-1570 (SVN), 2022 WL 3043546, at *6 (D. Conn. Aug. 2, 2022) (noting that "overly tight handcuffing can constitute excessive force in certain cases") (citation modified); *Alston v. Lindsey*, No. 3:15-cv-1673 (AVC), 2017 WL 1338087, at *3 (D. Conn. Apr. 7, 2017) (noting that "[u]nwarranted placement on in-cell restraint status can constitute the use of excessive force" in certain circumstances).

Plaintiff alleges both that his handcuffs were on "way to[o] tight" and cutting into Plaintiff's wrists, ECF No. 23 ¶ 19, and that he was wearing these handcuffs while in the dry cell, *see id.* ¶ 18. Each allegation separately could give rise to an excessive force claim. *See Witt*, 2022 WL 3043546, at *6; *Alston*, 2017 WL 1338087, at *3. But, as with his excessive force claim based on the use of chemical spray, Plaintiff does not allege which defendant placed him in overly tight handcuffs or which defendant ensured that Plaintiff remained handcuffed while in the dry cell. Accordingly, an excessive force claim based on overly tight handcuffs or in-cell restraints must be dismissed for lack of personal involvement. *See Gonzalez*, 2019 WL 2603533, at *8.

For the reasons stated above, Plaintiff may pursue an Eighth Amendment excessive force claims for damages against Defendants Soto and Dipietrantonio in their individual capacities. All other Eighth Amendment excessive force claims are dismissed for failure to state a claim. 28 U.S.C. § 1915A(b)(1).

**2. Failure to Intervene Claims**

"Prison officials can also be held liable under section 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *Huertas v. Guadarrama*, No. 3:25-cv-118 (SRU), 2025 WL 1868045, at *5 (D. Conn. July 7, 2025) (citation modified). "To state a claim for a prison official's failure to intervene, a plaintiff must allege facts showing that: (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) the officer knew that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene." *Deegan v. Doe #1*, No. 3:19-cv-1356 (MPS), 2019 WL 5964816, at *3 (D. Conn. Nov. 13, 2019) (citation modified). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)).

Although Plaintiff does not directly implicate most of the defendants as being personally involved in the use of excessive force, he names several defendants who were present when officers used excessive force but did nothing to stop it. For instance, Plaintiff alleges that Defendants Soto, Eckler, Baez, Dipietrantonio, Caputo, Grasso, Betances, Bosque, and Milner were present when officers used chemical spray on Plaintiff. ECF No. 23 ¶ 8. For purposes of initial review, the court both presumes that the use of chemical agent was an excessive use of force and infers that these Defendants did nothing to stop it. Accordingly, the court will permit Plaintiff to pursue an Eighth Amendment failure to intervene claim against Defendants Soto, Eckler, Baez,

Dipietrantonio, Caputo, Grasso, Betances, Bosque, and Milner based on the use of chemical spray.

Plaintiff also alleges that he told Defendants Betances, Bosque, and Milner "numerous times" that Defendants Soto and Dipietrantonio were hurting his wrists. *Id.* ¶ 13. He alleges that Defendant Baez told him to "stop resisting," while Defendants Soto and Dipietrantonio were hurting his wrists. *See id.* ¶ 14. And Plaintiff alleges that Defendant Grasso was videorecording this use of force. *Id.* ¶ 15. Because the court has determined that Plaintiff alleges a plausible claim Defendants Soto and Dipietrantonio used excessive force on Plaintiff and because the court infers that these defendants were present but did nothing to stop it, the court will permit Plaintiff to pursue an Eighth Amendment failure to intervene claim against Defendants Betances, Bosque, Milner, Baez, and Grasso based on the force used during the escort to the dry cell.

Lastly, although Plaintiff does not allege who placed overly tight handcuffs on him or who ensured that he remained in restraints in the dry cell, Plaintiff alleges that Defendant Bonetti said the handcuffs were "fine" and "approved the restraint check," *id.* ¶ 18, and that Defendant Baez "brushed off" and "ignored" Plaintiff's concerns about his overly tight handcuffs, *id.* ¶ 19 (citation modified). For purposes of initial review, the court presumes that the use of overly tight handcuffs and in-cell restraints constitutes a use of excessive force. And the court infers that Defendants Bonetti and Baez did nothing to stop it. *See id.* ¶¶ 18–19. Accordingly, the court will permit Plaintiff to pursue Eighth Amendment failure intervene claims against Defendants Bonetti and Baez based on the use of overly tight handcuffs and in-cell restraints.

For the reasons stated above, Plaintiff may pursue failure to intervene claims for damages against Defendants Soto, Eckler, Baez, Dipietrantonio, Caputo, Grasso, Betances, Bosque, Milner, and Bonetti in their individual capacities.

**3. <u>Deliberate Indifference to Serious Medical Needs Claims</u>**

To state a claim for deliberate indifference to serious medical needs under the Eighth Amendment, the prisoner must allege facts satisfying two components, one objective and one subjective. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). The objective component requires the prisoner to demonstrate that the alleged deprivation of medical care was "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation modified). This objective showing, in turn, requires a court to make two inquiries. *See Salahuddin*, 467 F.3d at 279.

First, the court must determine whether the inmate was "actually deprived of adequate medical care" by an official's failure "to take reasonable measures in response to a sufficiently serious medical condition[.]" *Id.* at 279–80 (citation modified); *see also Davila v. UConn Med. Ctr.*, 353 Fed. Appx 490, 492 (2d Cir. 2009) (summary order) ("At the most basic level, to establish a claim under the Eighth Amendment for deliberate indifference, the plaintiff must first demonstrate that he was 'actually deprived of adequate medical care.'" (quoting *Salahuddin*, 467 F.3d at 279)). "[P]rison officials who act reasonably in response to an inmate-health risk cannot be found liable under the [Eighth Amendment], and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability." *Salahuddin*, 467 F.3d at 279–80 (cleaned up).

Second, the court must determine "whether the inadequacy in medical care is

sufficiently serious," requiring an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has or will likely cause the prisoner." *Id.* at 280. This examination differs based on whether the issue is failure to provide *any* medical treatment, inadequate treatment, or delayed treatment. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). Thus, this inquiry is necessarily contextual and fact-specific. *Id.* at 185.

If a plaintiff was completely deprived of medical care, "courts examine whether [their] medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. If the plaintiff received medical treatment, but it was inadequate, "the seriousness inquiry is narrower," and "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id*. (citation modified).

"In considering whether a delay [in treatment] caused a risk of harm, a court may consider 'the absence of adverse medical effects or demonstrable physical injury.'" *Valdiviezo*, 752 Fed. Appx at 32 (citation modified) (quoting *Smith*, 316 F.3d at 187). If a plaintiff's medical condition was not aggravated by the delay, a plaintiff cannot satisfy the objective component. *See*, *e.g.*, *id.* (holding that district court properly dismissed plaintiff's claim based on a denial of medical care because, "[a]lthough [plaintiff] alleged that he remained in pain during the hour-long wait, he d[id] not allege that the delay exacerbated his injuries from his initial fall"); *Bilal v. White*, 494 Fed. Appx 143, 146 (2d Cir. 2012) (summary order) (delay in treatment did not satisfy objective component because "there [wa]s no evidence that [plaintiff's] conditions worsened over the hours of delay here").

As to the subjective component, "[a]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety," which is "a state of mind equivalent to the familiar standard of recklessness as used in criminal law." *Smith*, 316 F.3d at 184 (citation modified) (citing *Chance,* 143 F.3d at 702; *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002)). Conduct may rise to the level of deliberate indifference when the prison official's act or failure to act "evinces a conscious disregard of a substantial risk of serious harm." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation modified) (citing *Farmer*, 511 U.S. at 839).

But a "mere disagreement" with a "form of treatment does not establish deliberate indifference," *Demata v. N.Y. State Corr. Dep't of Health Servs.*, No. 99-0066, 1999 WL 753142, at *3 (2d Cir. 1999) (citing *Chance,* 143 F.3d at 703), "[n]or does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred," *Young v. Choinski*, 15 F. Supp. 3d 172, 182–83 (D. Conn. 2014) (citation modified). "[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference," either. *Hathaway*, 99 F.3d at 553.

The court liberally construes the complaint as alleging five incidents which potentially could give rise to an Eighth Amendment deliberate indifference to serious medical needs claim: (1) Defendants Baez and Eckler's refusal to permit Plaintiff to seek medical treatment for his headache; (2) prison officials' failure to decontaminate Plaintiff after using chemical spray on him; (3) Defendant Cummings's response to finding Plaintiff unresponsive in the dry cell; (4) Defendants Baez and Eckler's refusal to permit Plaintiff to seek medical treatment for his wrist injury; and (5) Defendant Estime's inadequate

treatment of Plaintiff during their initial meeting after officers injured Plaintiff's wrist. The court discusses each incident in turn.

**a. <u>Refusal to Permit Treatment for a Headache</u>**

Plaintiff's allegations adequately suggest that he was "actually deprived of adequate medical care," *Salahuddin*, 467 F.3d at 279, when Defendants Baez and Eckler refused to permit Plaintiff to see medical staff for his headache, *see* ECF No. 23 ¶¶ 3, 5. Thus, the court must consider, under the second inquiry of the objective component, "whether the inadequacy in medical care is sufficiently serious," *Salahuddin*, 467 F.3d at 280, by examining whether these defendants failed to provide any treatment, provided inadequate treatment, or delayed treatment, *see Smith*, 316 F.3d at 185–86.

Defendants Baez and Eckler did not permit plaintiff to see medical staff for any treatment, *see* ECF No. 23 ¶¶ 3, 5, so the court must "examine whether [his] medical condition is sufficiently serious," *Salahuddin*, 467 F.3d at 280. "[H]eadaches themselves do not constitute a sufficiently serious medical condition," *Rivera v. Dep't of Corr.*, No. 3:24-cv-1462 (KAD), 2024 WL 4766211, at *3 (D. Conn. Nov. 13, 2024), so Plaintiff's allegations are incapable of satisfying the second component of the objective element. Accordingly, any deliberate indifference to serious medical needs claim based on Defendants Baez and Eckler's refusal to permit Plaintiff to see medical staff for his headache must be dismissed.

**b. <u>Failure to Decontaminate</u>**

The failure to decontaminate a prisoner after prison officials used chemical spray

on him may give rise to an Eighth Amendment deliberate indifference to serious medical needs claim. *See, e.g.*, *Al-Bukhari v. Semple*, No. 3:16-cv-1428 (SRU), 2017 WL 2125746, at *4 (D. Conn. May 16, 2017) (prisoner stated Eighth Amendment claim for deliberate indifference to serious medical needs by "alleg[ing] that he informed the correctional officers and nurses that he was suffering from extreme pain as a result of being sprayed with a chemical agent and the staff repeatedly denied his requests for an adequate shower to clean himself and decontaminate the agent").

Plaintiff alleges that Defendant Betances "told staff to 'put [Plaintiff] in the shower'" to be decontaminated. ECF No. 23 ¶ 10. But instead of doing that, "staff pushed the Plaintiff into a wall while handcuffed and put a spit mask over his head when he was drooling and spit on the wall in front of him to attempt to clear his clear his throat of chemical agent." *Id.* Although these allegations, liberally construed, may give rise to an Eighth Amendment claim based on a failure to decontaminate Plaintiff, *see Al-Bukhari*, 2017 WL 2125746, at *4, Plaintiff's reference to "staff," ECF No. 23 ¶ 10, does not establish the personal involvement of any single defendant, *see Bugg v. Quiros*, No. 3:26-cv-996 (SRU), 2026 WL 2254800, at *3 (D. Conn. Aug. 5, 2026) (using "terms like 'Defendants,' 'medical staff,' and 'correctional officers' throughout his complaint, without differentiating which defendants, medical staff members, or correctional officers allegedly engaged in the acts that violated his constitutional rights" did not establish any defendant's personal involvement). Accordingly, any deliberate indifference to serious medical needs claim based on the refusal of prison staff to decontaminate Plaintiff must be dismissed.

**c. Defendant Cummings' Response to the Code White**

Plaintiff does not allege sufficient facts suggesting that Defendant Cummings "actually deprived [Plaintiff] of adequate medical care." *Salahuddin*, 467 F.3d at 279. Defendant Cummings did not ignore the Code White—he responded to it. ECF No. 23 ¶ 21. And when Defendant Cummings responded to the Code White, he listened to Plaintiff's concerns. *Id.* Plaintiff asserts that Defendant Cummings "refused to acknowledge" Plaintiff's injuries, *id.*, but Plaintiff does not describe what he expected Defendant Cummings to do in the dry cell other than to evaluate Plaintiff, as Defendant Cummings did. Accordingly, any deliberate indifference to serious medical needs claim against Defendant Cummings must be dismissed.

**d. Refusal to Permit Treatment for Wrist Injury**

Plaintiff's allegations adequately suggest that he was "actually deprived of adequate medical care," *Salahuddin*, 467 F.3d at 279, when Defendants Baez and Eckler refused to permit Plaintiff to see medical staff for his wrist injury, *see* ECF No. 23 ¶ 24. Unlike with the headache, Plaintiff saw Defendant Estime for his wrist injury two days after officers broke Plaintiff's wrist. *Id.* ¶ 25.

Although it is sometimes difficult to determine whether prison officials delayed or denied treatment, *see Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) ("This is *not* a case of *delayed* treatment as the dissent suggests."), courts in this district have concluded that if a defendant initially denies a plaintiff medical treatment but another medical professional eventually provides the plaintiff medical treatment, the defendant's initial denial of medical treatment constitutes a delay in treatment, rather than a denial of

treatment, *see*, *e.g.*, *Burns v. Lupis*, No. 3:23-cv-23 (KAD), 2023 WL 1801704, *2, *4 (D. Conn. Feb. 7, 2023) (allegations that defendant-doctor denied a bottom bunk pass to an inmate with a torn meniscus “involve[d] a delay in treatment, as opposed to a denial of treatment” because another doctor later issued the inmate a lower bunk pass and prescribed ibuprofen for the inmate’s knee).

Because Defendants Baez and Eckler initially denied Plaintiff’s request to see medical staff for wrist injury, ECF No. 23 ¶ 24, but Defendant Estime later saw Plaintiff for the injury two days later, *id.* ¶ 25, the court liberally construes the complaint as alleging a delay in treatment, rather than a denial of treatment, *see Burns*, 2023 WL 1801704, at *4. Thus, the court “focus[es] on the challenged delay or interruption in treatment rather than the prisoner’s underlying medical condition alone.” *Salahuddin*, 467 F.3d at 280 (citation modified); *see also Nelson v. Sullivan*, No. 3:23-cv-878 (SVN), 2025 WL 2494272, at *6 (D. Conn. Aug. 29, 2025) (because plaintiff “received *some* treatment in the form of topical lidocaine, the Court’s inquiry focuses on whether this treatment was inadequate and whether he was harmed by the delay in obtaining what he believes is adequate treatment (surgery)” (emphasis original)).

Here, “the challenged delay or interruption in treatment,” *Salahuddin*, 467 F.3d at 280 (citation modified), lasted two days, *see* ECF No. 23 ¶¶ 24–25. But Plaintiff does not allege facts suggesting that his condition worsened while awaiting the treatment he eventually received. As such, Plaintiff has not alleged facts satisfying the objective component of his deliberate indifference claim. *See Valdiviezo*, 752 Fed. Appx at 32; *Bilal*, 494 Fed. Appx at 146. Accordingly, any deliberate indifference to serious medical

needs claim based on Defendants Baez and Eckler's refusal to permit Plaintiff to see medical staff for his wrist injury must be dismissed.

**e. <u>Defendant Estime's Inadequate Treatment</u>**

Plaintiff does not allege sufficient facts suggesting that Defendant Estime "actually deprived [Plaintiff] of adequate medical care." *Salahuddin*, 467 F.3d at 279. When Plaintiff met with Defendant Estime, the doctor examined Plaintiff, diagnosed Plaintiff with a "significant injury," and ordered X-rays of Plaintiff's right wrist. ECF No. 23 ¶ 26. The Second Circuit has held that plaintiffs who underwent similar examinations were not "actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279; *see*, *e.g.*, *Davila v. UConn Med. Ctr.*, 353 Fed. Appx 490, 493 (2d Cir. 2009) (summary order) (concluding that plaintiff "failed to show that he was actually deprived of adequate medical care" because even though defendants "failed to provide him, *inter alia,* medication to alleviate his chronic knee pain, the record shows that qualified physicians carefully examined [plaintiff] and concluded that this treatment was unnecessary given the condition of his knee and his overall health and mobility."). Accordingly, any deliberate indifference claim against Defendant Estime based on inadequate medical care provided at Plaintiff's initial examination must be dismissed.

For the reasons stated above, all deliberate indifference to serious medical needs claims must be dismissed for failure to state a claim. 28 U.S.C. § 1915A(b)(1).

**4. <u>Other Claims</u>**

Plaintiff alludes to other claims that bear mentioning but otherwise fail. First, to the extent that Plaintiff alleges that any defendant violated his constitutional rights by violating

DOC policy, *see*, *e.g.*, ECF No. 23 ¶¶ 10, 15, "a prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983," *Fine v. UConn Med.*, No. 3:18-cv-530 (JAM), 2019 WL 236726, at *9 (D. Conn. Jan. 16, 2019).

Second, to the extent that Plaintiff alleges that Defendants Estime and Rodriguez violated his constitutional rights when they "withheld . . . X-ray results and other documentation" from him upon request, *see* ECF No. 23 ¶ 28, Plaintiff has no constitutional right to obtain such materials, *see*, *e.g.*, *Crenshaw v. Dep't of Corr.*, No. 3:24-cv-439, 2024 WL 3638242, at *8 (D. Conn. Aug. 1, 2024) (noting that "courts have generally held that prisoners do not have a constitutional right to review or obtain copies of their prison medical records"). Accordingly, any claims based on the violation of DOC policy or the withholding of medical records must be dismissed for failure to state a claim. 28 U.S.C. § 1915A(b)(1).

## III. <u>ORDERS</u>

For the reasons stated above, the court hereby orders as follows:

1. Plaintiff may pursue Eighth Amendment excessive force claims for damages against Defendants Soto and Dipietrantonio in their individual capacities. Plaintiff may also pursue Eighth Amendment failure to intervene claims for damages against Defendants Soto, Eckler, Baez, Dipietrantonio, Caputo, Grasso, Betances, Bosque, Milner, and Bonetti in their individual capacities. All other claims are dismissed, and all other defendants are terminated.

2. The Clerk of Court respectfully is asked to please verify the current work address for Defendants Soto, Eckler, Baez, Dipietrantonio, Caputo, Grasso, Betances, Bosque, Milner, and Bonetti with the DOC Office of Legal Affairs, and to please mail to Defendants (at their confirmed addresses) a waiver of service of process request packet containing the complaint and this order within twenty-one (21) days of its issuance, and also to report to the court on the status of the waiver request on the thirty-fifth (35th) day after mailing. If any defendant fails to return the waiver request, the Clerk shall please arrange for in-person service on that defendant in his or her individual capacity by the United States Marshals Service, and that defendant shall be required to pay the cost of such service.
3. Additionally, the Clerk is asked to please send Plaintiff a copy of this Order.
4. The Clerk also is asked to please send a courtesy copy of the complaint and this order to the DOC Office of Legal Affairs and to the Office of the Attorney General.
5. Defendants shall file a response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date that the waiver of service forms are sent. If Defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. Defendants also may include all additional defenses permitted by the Federal Rules.
6. Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed on or before **June 4, 2027**. Discovery requests need not be filed with the court.
7. All summary judgment motions shall be filed on or before **July 6, 2027**.

8. Under Local Rule 7(a)(2), any nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date that such dispositive motion was filed. If no response is filed, or if the response is not timely, the dispositive motion can be granted absent objection.
9. If Plaintiff changes his address at any time during the litigation of this case, Local Rule 83.1(d)(1) provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address. Plaintiff also should notify Defendants or the attorney for Defendants of his new address.
10. Plaintiff shall utilize the Prisoner Electronic Filing Program ("the Program") when filing documents with the court. Plaintiff is advised that the Program may be used only to file documents with the court. As local court rules provide that discovery requests are not filed with the court, discovery requests must be served on Defendants' counsel by regular mail.
11. The Clerk immediately shall please enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall please send to Plaintiff a copy of the same.

**IT SO ORDERED** at Hartford, Connecticut, this 6th day of November, 2026.

/s/
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE